731 S.E.2d 312

**The STATE, Respondent,**

v.

**Christopher HELLER, Appellant.**

**No. 4990.**

Court of Appeals of South Carolina.

Heard March 13, 2012.

Decided June 13, 2012.

Chief Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General J. Anthony Mabry, all of Columbia, and Solicitor Warren B. Giese, of Columbia, for Respondent.

HUFF, J.

Following a jury trial, Christopher Heller was convicted of murder and assault and battery with intent to kill (ABWIK). Heller appeals, asserting the trial court erred in (1) allowing him to be impeached with his prior drug convictions pursuant to Rule 609(a)(1), SCRE, because the probative value of his drug convictions substantially outweighed their unduly prejudicial effect, (2) refusing to declare a mistrial where a witness made reference to Heller being on parole, and (3) refusing to grant an in camera hearing on the admissibility of a witness's voice identification of Heller. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

In the early morning hours of August 25, 2006, a paramedic, responding to an unknown medical complaint at a trailer park, found Gustavo Guzman–Hernandez, known as "Chino," lying in the roadway.[1] As the paramedic approached, he encountered another man, who could not communicate in English. This person pointed to a trailer with an open door. The paramedic pronounced Chino dead and left the scene to wait on law enforcement to advise that the scene was secure. After Officer Clark arrived and entered the trailer, he heard moaning and then found Mary Deanna Chavis (Mary) inside the trailer.

Mary was grievously wounded, with multiple lacerations and evisceration of her bowel. The attack on Mary was so brutal, medical personnel did not expect her to live. She had multiple stab wounds to her face, chest, neck, head and hands, with a laceration to her left lower quadrant in which the muscle had been completely transected and her intestines were protruding from her abdomen. However, after multiple surgeries, Mary did survive her wounds. An autopsy on Chino likewise revealed he suffered from numerous stab wounds, including four to his face, defensive wounds to his hand, a deep wound to his left shoulder, and a fatal, slashing stab wound to the right side of his chest which penetrated his heart. The pathologist opined a single-edged weapon, such as a knife, caused Chino's injuries, and stated that a pocketknife is usually used in cases such as this. He determined the blade would likely have been three to four inches long but could have been longer.

The State presented the testimony of Billie Joe Risinger, known as "Tracy," who was present at Mary's trailer on the night of the stabbings. Tracy, who admitted she was addicted to crack cocaine, stated that on August 25, 2006, she saw Mary sitting with some other friends in Mary's front yard. Tracy testified that they all had the same addiction, and she called one of their drug suppliers, Kevin Nails, who came over and "served them." Tracy said she then left in a car with Kevin, along with a man named Devon and the defendant, Christopher Heller, who she had never seen before that night. Kevin

---

1. Gustavo also had nicknames of "Mechanic" and "Mechanico," but was primarily referred to throughout the testimony as "Chino."

"serve[d] somebody else some drugs" and the group returned to Mary's trailer, where they found Mary and Chino. After Tracy engaged in sexual intercourse with Devon, Kevin and Devon left the trailer, leaving Heller with Tracy, Mary, and Chino at the trailer. The entire group smoked some crack, and Heller began acting strangely, removing and then putting back on his shoes and shirt. Heller also attempted to follow Tracy when she tried to leave, making Tracy feel uncomfortable. Because of his behavior, Mary politely told Heller he had to leave. Heller initially left the trailer, but then knocked on the door three to five minutes later. At this point, Chino left to get a phone so they could contact Kevin to come get Heller. With only Mary and Tracy left in the house, they heard a knock at the door. Over trial counsel's objection, Tracy identified the voice she heard at the time of the knocking as belonging to Heller. When she heard his voice, she told Mary not to open the door, but Mary told Tracy to just shut the bedroom door, as Tracy was in the bedroom at the time. Tracy heard a lot of banging and screaming, and heard Mary screaming for her life, so she locked the door and hid under the bed. Eventually, Tracy heard Mary say that she was dying and her "guts [were] hanging out." After Tracy asked where the man was, and Mary responded that she did not know, Tracy opened the door and fled from the trailer. When she got outside, she saw Chino, face down in the street. Tracy began knocking on trailer doors to obtain a phone to call for help, but then saw Kevin ride by in his car. She flagged down Kevin and told him his "cousin had went crazy, and he was trying to kill everybody." Kevin took Tracy to another location, where she called her mother, who then picked up Tracy and took Tracy back to her house. The next day, law enforcement contacted Tracy about the matter, and Tracy told them what occurred, with the exception of naming Kevin. The following day, however, she told law enforcement about Kevin and helped identify him. Thereafter, on August 29, Tracy helped develop a composite picture of a man's face, as well as of tattoos she observed on his body.[2] On August 30, she identified Heller in a photographic line-up.

---

2. Tracy testified she could not remember exactly where on his body she had seen the tattoos, but she was sure there was one that said "made man," and a tattoo that had dollar signs, and she thought there may be

162

The State additionally presented the testimony of Kevin. Kevin stated that in August 2006, his cousin, Heller, was staying with Kevin's family in Lexington because Heller was supposed to go with Kevin's mother and grandmother to Cherokee, North Carolina for the weekend. On August 25, at around 3:00 a.m., Kevin, Heller, and Devon went to Mary's trailer, where they saw Mary, Tracy, and "the Mechanic" (Chino). Kevin, Devon, Tracy, Mary, and "the Mechanic" started smoking drugs. Devon and Tracy went into a bedroom to engage in sexual intercourse, and after they came out, Heller and Tracy went into the bedroom. At that time, Kevin received a phone call and needed to leave Mary's house. Devon went with Kevin, and when Kevin called Heller to go with them, Heller became upset because he wanted to have sex with Tracy. Kevin then told Heller to just stay with Tracy, and he would return to pick up Heller. Kevin and Devon then left. Sometime later, after dropping Devon off somewhere, Kevin drove back to Mary's trailer to get Heller. When he honked his horn but got no response, he left Mary's home, and then saw Tracy at the top of the hill. Tracy then jumped in his car stating, "Your boy, your boy snapped." When Kevin asked Tracy where Heller was, she told him that she did not know, and that Heller had left. Kevin dropped Tracy off at another trailer park and then phoned his mother, who joined him to drive around looking for Heller. When they reached Tracy's trailer and observed the blue lights, Kevin panicked and continued driving. They tried to find Heller, but to no avail. Later that same day, around 9:30 p.m., Kevin received a call from Heller. Kevin drove to pick up Heller, and they then met Kevin's mother at a Burger King. Kevin's mother took Heller to Lexington, and then she drove him to Baxley, Georgia the next day.

Mary Chavis also took the stand and testified to the circumstances surrounding the stabbings that night. According to Mary, in the early morning hours of August 25, 2006, she and

one of an eye. One of the investigators testified that he viewed tattoos on Heller's body, that Heller had "made man" under his chest area, and on his arms he had around "three money signs" and underneath that "my eyes only," with the word "eyes" being depicted by the drawing of an eye and an apostrophe "s." Heller also acknowledged that he had tattoos of two dollar signs on his left arm and "made man" across his chest.

Chino saw Tracy riding in a car with Kevin, who Mary knew, and two other men, who Mary did not know. Tracy asked to go in Mary's house, so Mary gave her the key. Mary told Tracy she and Chino were going to the store, and instructed her to put the key back in a flower pot. When Mary and Chino returned to her home, the people were still in her home, which made Mary uncomfortable, so she and Chino left. When Mary and Chino returned to her home the second time, the car the men had been riding in was no longer there, so they walked inside and went to Mary's room and started playing cards. Mary stated they did not see or hear anyone in the house at that time, but then heard someone arguing. When Mary opened her door, she found Tracy and Heller arguing in her living room. Mary asked what the problem was, and Heller claimed Tracy stole $7 from him, and that "he had put all of his stuff on the crack pipe and [Tracy] wouldn't let him have any." Mary asked Tracy to give Heller the pipe, but she refused. Mary then gave Heller $20 and smoked a piece of crack with him and told Heller to leave Tracy alone, explaining she had paid Heller an extra $13 so there would not be any trouble. While sitting in Mary's bedroom, Heller began taking off his shirt and shoes. When Mary asked him what he was doing and Heller did not answer, Mary told him he needed to put his clothes on and that he would have to leave her house. Heller got dressed, but told Mary he had nowhere to go. Mary told him to walk across the street and talk to someone over there, as the man across the street had a phone. She then watched Heller from her window as he walked to the home and knocked on the door. When no one answered, she observed Heller walk back to her home. Heller knocked on her door and stated that he had nowhere to go and did not know anyone around there. At this point, Mary asked Chino to let Heller use his phone to call Kevin for a ride, and Chino and Heller then left Mary's trailer. Mary and Tracy were in Mary's bedroom, waiting for Chino to return, when there was another knock at the door. Because she thought it was Chino, Mary opened the door without looking to see who it was. Heller was standing at the door, and when he tried to come inside, Mary put her hand on his chest and asked him, "What is the problem? What's up?" By the time she got these words out, Heller said something and started stabbing

her. Mary stated she fought Heller as long as she could with her hands, but then could fight no longer. She yelled for Tracy to help her, but Tracy wanted to know who was out there, to which Mary responded that it was "the same man from before." Mary decided to back up so she could try to kick Heller, but as she did so, he stabbed her in her stomach with the knife. The more she kicked Heller, the more her intestines would come out, so she eventually curled up into a ball on the couch, where Heller continued to stab her. Eventually, Heller stopped stabbing her and ran out the door. Mary then got up from the couch and went to her bedroom door, begging Tracy to pack her wounds before she bled to death, but Tracy would not open the door. Mary slid down the wall and yelled for help, but had to stop when she saw that this action increased her bleeding. Tracy finally opened the door, and jumped over Mary and ran out the front door. At some point, both Chino and Heller came back inside the trailer. Mary testified that Heller had taken off his shirt, and he sat on the couch where he had been stabbing Mary. Chino ran in the trailer and "bent over to get the guy and something happened." Mary saw a movement, saw arms move, and then saw Chino run out the door with Heller running behind him. Mary then drifted in and out of consciousness, but remembered the police and EMS arriving, whereupon she was transported to the hospital. A sketch artist visited Mary in the hospital on August 28, 2006, and drew a composite of the person Mary described as her attacker. On August 30, investigators also visited her in the hospital and showed her a photographic line-up, from which Mary identified Heller. Mary also made an in-court identification of Heller as the person who attacked her in her home. She testified "beyond a shadow of a doubt" that Heller was her attacker.

After Heller was developed as a suspect, investigators from South Carolina traveled to Baxley, Georgia, where a search warrant was executed on the residence where Heller resided. Heller later turned himself in at the Appling County Sheriff's Department, where he gave the South Carolina authorities a statement implicating himself in the matter. Specifically, when asked what had occurred in Columbia, South Carolina around 4:00 a.m. on August 25, 2006, Heller stated as follows:

> My cousin Kevin Nails and another black male left the Oasis club. My cousin stopped in the roadway to pick up and (sic) little white girl that was walking. Kevin dropped the girl and I off at (sic) trailer. Inside the trailer was a white lady and a Mexican man. The lady let us in. Once inside the white girl that Kevin picked up and I went into a bedroom and started smoking crack. I went outside for a few minutes and when I came back inside the lady that lived there told me I had to go. I told her I was waiting on Kevin to come back and pick me up. I just started stabbing the people.

Asked where he had obtained the knife, Heller replied, "It was mine; it was a fold up knife. It had a brown handle. The blade was about 2 or 3 inches long." When asked who he started stabbing first, Heller stated, "The lady, the man jumped on my back inside the trailer." Heller further indicated, after stabbing the lady and man, he ran and found an old empty trailer and hid there until around dark. He asked a lady if he could use her phone to call someone to pick him up, and he called Kevin. He stayed at the lady's house until Kevin arrived, and Kevin called "mother, Carolyn Robinson," who met them on the interstate. Kevin's mother took Heller to his mother's home in Georgia. Heller stated he threw the knife somewhere after leaving the girls' trailer. He also indicated he was in Columbia for the purpose of going to the casino in Cherokee, North Carolina with Kevin and his aunt, Carolyn Robinson. The investigators testified they did not make any promises or threaten, coerce, or force Heller to give his statement, nor did they make any sort of threats or promises concerning Heller's family members.

Once the investigators returned to Richland County with Heller, they drove to the area of Mary's trailer park, where Heller pointed out a small, abandoned trailer he claimed to have stayed in between the time of the incident and going to call Kevin. Heller was also asked to show them the area where he threw the knife. The investigators then drove Heller to the Sheriff's Department. A few days later, one of the investigators took Heller back to the trailer park area, where Heller gave more information to narrow down where he threw the knife. However, the authorities were never able to locate the knife.

Heller presented the testimony of his mother, Loranda, and himself in his defense. Loranda testified to the circumstances surrounding the execution of the search warrant in Baxley, Georgia, and the officers taking her and Heller's friend, Jena, to the sheriff's department. Specifically, Loranda stated that the officers pointed a gun at her; she had a heart condition that included a heart attack; they transported her and Jena to headquarters; the Appling County Sheriff read her rights to her; she informed him she desired an attorney; she was then put inside a holding cell; and the Sheriff told her both Georgia and South Carolina were going to charge her with aiding and abetting. Loranda testified she was released after seeing her son in the courtroom, and no one ever said anything else to her about any charges related to this incident.

Heller testified in his own defense. He acknowledged he was with Kevin and Devon on August 25, when Kevin picked up a white girl who had called him. They then went to Mary's, where Devon went into a back room with Tracy. After that, Heller stated he went back there with Tracy and smoked crack. Tracy started arguing with him about drugs, and though Heller was not mad or hostile, "the lady" told him he should leave and informed him he should go across the street to use a man's phone. Heller claims he then left without argument, but the man across the street would not allow him to use the phone. According to Heller, he then walked to a store and used a pay phone to call his cousin, but the call was dropped. Heller then went to an abandoned trailer and stayed there "until [his] high went down." Heller acknowledged he was drinking, smoking crack, and smoking weed that night. Once he "calmed down," some twelve to thirteen hours later, he borrowed a phone from a lady and called Kevin again. Kevin picked him up and took him to a store where they met up with Heller's aunt. He stayed at his aunt's house that night, and the next day she took him home to Baxley, Georgia. While in Georgia, Heller found out his mother had been taken downtown. Concerned about his mother's heart condition, he went to the local Sheriff's Department, where he was told he was a suspect. Heller claimed the South Carolina investigators told him they were charging his mother with aiding and abetting, and the only way they would release her and his girlfriend was if Heller "[took] these

charges." Heller claimed he signed a paper they presented to him, and the investigators then read him his rights. One of the investigators then pulled out a laptop and started typing a statement.

Heller denied stabbing or killing anyone on the night in question. He admitted going to Mary's trailer with Kevin and Devon after picking up Tracy and smoking crack with Tracy, but denied smoking crack with Mary. He acknowledged that Kevin received a call and Kevin and Devon left, but he wanted to stay to have sex with Tracy. Heller agreed that he was there at the trailer with Mary, Tracy and Chino; he went into the back bedroom and smoked crack with Tracy; he argued with Tracy; Mary told him to leave because she did not like the arguing; he went across the street to use a phone, but the person would not let him; and he ended up staying in an abandoned trailer all night and through the daylight hours until about 9:30 p.m., when he finally saw Kevin.

Heller disavowed parts of the statement he signed. Specifically, he acknowledged the parts of the statement indicating he went to a trailer, they picked up a girl, and he and the girl got into a little argument whereupon he was asked to leave. He also testified he indicated in his statement that he went into a bedroom with the white girl Kevin had picked up and they started smoking crack, and when the lady that lived there told him he had to leave, he told her he was waiting for Kevin "to come back and pick him up." However, he claimed he told the investigators he did not know anything about a knife, acknowledging only that he had a little key-chain pocketknife. Heller denied stating that "a white lady and a Mexican man" were inside the trailer," that the lady let him inside, and that he "just started stabbing people." He further denied ever saying anything regarding who he stabbed first, what he did after stabbing the lady and the man, and what happened to the knife. Heller also testified, when they got back to South Carolina, he showed the investigators the abandoned trailer in which he stayed, but claimed when they asked where he threw the knife, he told them he did not know anything about a knife. He further testified that he was not given the statement to read over it until he was back in South Carolina, and though he was read and he signed his waiver of rights, he did so because he did not have a choice.

Following submission of the case to the jury, Heller was convicted of the murder of Chino, as well as ABWIK in regard to Mary. This appeal follows.

## ISSUES

1. Whether the court erred by allowing impeachment of Heller with his prior drug convictions pursuant to rule 609(a)(1), SCRE, because the probative value of these drug and drug dealing convictions was substantially outweighed by their unduly prejudicial effect, particularly where the solicitor admitted the nature of the convictions made them relevant to whether the jury believed Heller that the police were lying and coerced his statement, since this impermissibly invited the jury to find Heller was acting in character in this case with his past drug convictions.

2. Whether the court erred by refusing to declare a mistrial where witness Kevin Nails testified, in response to the solicitor's question about where Heller was going after he left South Carolina, that Heller had to get back to Georgia because he was on "parole leave," since defense counsel made a pretrial motion to exclude this evidence, and he correctly argued a curative instruction was not going to solve the prejudice.

3. Whether the court erred by refusing to grant defense counsel an in camera hearing on the proper foundation being laid for witness Tracy Risinger's voice identification of Heller as the man who knocked on the door and spoke immediately before the murder because a proper foundation for Risinger's voice identification evidence was never established for this extraordinarily prejudicial claim.

## LAW/ANALYSIS

### A. Impeachment with prior drug convictions

Prior to Heller taking the stand, the solicitor argued she should be allowed to impeach Heller with five previous convictions, should Heller decide to testify. She stated Heller had a 1999 conviction for possession with intent to distribute (PWID) marijuana, and he pled guilty to four other drug charges on the same date in 2001, including another PWID marijuana, two counts of "manufacture, sell, dispense distribute with intent to distribute" charges, and one count of drug

trafficking within 1,000 feet of a park, recreation facility or public housing. Trial counsel objected, arguing under Rule 609(a)(1), SCRE, these convictions were subject to a Rule 403, SCRE, analysis, and because evidence showing Heller was a drug dealer was very prejudicial and there was no probative value to the charges, the prejudice outweighed the probative value, and the State was offering these convictions strictly as propensity evidence. The trial court denied the motion, finding the convictions admissible.

When Heller took the stand, he acknowledged in direct examination that he had been convicted of marijuana and cocaine charges and drug dealing. On cross-examination, Heller agreed he was convicted of PWID marijuana on April 8, 1999, and the other specific drug charges of PWID marijuana, two counts of manufacturing, selling, dispensing, and distributing with intent to distribute, and one count of drug trafficking within 1,000 feet of a park, recreation facility, or public housing on August 3, 2001.

On appeal, Heller argues Rule 609(a)(1), SCRE, allows a defendant to be impeached with a crime punishable by a sentence in excess of one year if the court, subject to a Rule 403, SCRE, determination,[3] finds the probative value outweighs its prejudicial effect, and only if the convictions are for crimes of dishonesty or false statements are such prior convictions automatically admissible under Rule 609(a)(2), SCRE. Heller contends the solicitor desired to impeach him with drug crimes so the jury would believe he was acting consistently with his past character at the time of the incident. He argues violations of narcotic drug laws are generally not probative of truthfulness, and it is improper to admit prior criminal convic-

---

**3.** The State points out that a Rule 403 balancing test is applied when a conviction is offered to impeach a witness who is not the defendant, and Rule 609(a)(1), SCRE provides its own balancing test in the case of impeaching a defendant, which is simply that the probative value of admitting such evidence outweighs its prejudicial effect to the accused. Thus, the State contends Heller has, both at trial and on appeal, objected "under the wrong rule." At any rate, the State contends the trial court committed no error in denying Heller's motion, whether applying the Rule 403, SCRE analysis, which requires evidence to be excluded if its probative value is *substantially outweighed* by the danger of undue prejudice, or the appropriate standard under Rule 609(a)(1).

tions as impeachment evidence to show a defendant acted in conformity with his prior record.

Rule 609(a), SCRE, provides as follows:

 For the purpose of attacking the credibility of a witness,

(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and

(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

Our supreme court has approved consideration of the following five factors, along with any other relevant factors, when weighing the probative value for impeachment of prior convictions against the prejudice to the accused: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the witness's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue. *State v. Colf,* 337 S.C. 622, 627, 525 S.E.2d 246, 248 (2000); *State v. Howard,* 384 S.C. 212, 221, 682 S.E.2d 42, 47 (Ct.App.2009). This court has noted a preference for an on-the-record *Colf* balancing test by the trial court under Rule 609(a)(1), SCRE. *See State v. Martin,* 347 S.C. 522, 530, 556 S.E.2d 706, 710 (Ct.App.2001) ("While *Colf* involved the admission of prior convictions more than ten years old under Rule 609(b), SCRE, this court has implicitly recognized the value of these factors in making such a determination under Rule 609(a)(1), and urged the trial bench to not only articulate its ruling, but also provide the basis for it, thereby clearly and easily informing the appellate courts that a meaningful balancing of the probative value and the prejudicial effect has taken place as required by Rule 609(a)(1).") (internal quotation marks omitted). Meaningful appellate review is best achieved when the trial court articulates its ruling

and the basis for it, when balancing the probative value of a prior conviction under Rule 609(a)(1), SCRE, against the prejudicial effect. *State v. Elmore,* 368 S.C. 230, 239, 628 S.E.2d 271, 275 (Ct.App.2006).

 Here, the trial court simply denied Heller's motion to exclude the prior convictions without performing an on-the-record *Colf* analysis. However, any error in a trial court's failure to conduct the proper balancing test under Rule 609, SCRE, may be considered harmless. *State v. Williams,* 380 S.C. 336, 344, 669 S.E.2d 640, 644 (Ct.App.2008). In order for an appellate court to reverse a case based on erroneous admission of prior convictions, prejudice must be shown. *State v. Young,* 378 S.C. 101, 107, 661 S.E.2d 387, 390 (2008). "Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result." *State v. Pagan,* 369 S.C. 201, 212, 631 S.E.2d 262, 267 (2006).

> A harmless error analysis is contextual and specific to the circumstances of the case: "No definite rule of law governs [a finding of harmless error]; rather the materiality and prejudicial character of the error must be determined from its relationship to the entire case. Error is harmless when it could not reasonably have affected the result of the trial."

*State v. Byers,* 392 S.C. 438, 447–48, 710 S.E.2d 55, 60 (2011) (quoting *State v. Reeves,* 301 S.C. 191, 193–94, 391 S.E.2d 241, 243 (1990)). Further, "[i]t is well settled that the admission of improper evidence is harmless where it is merely cumulative to other evidence." *State v. McFarlane,* 279 S.C. 327, 330, 306 S.E.2d 611, 613 (1983).

 Here, Mary positively identified Heller in a photographic line-up and thereafter made an in-court identification of Heller as the man she evicted from her home and who then returned and stabbed both her and Chino. Additionally, Tracy picked Heller from a photographic line-up and also identified Heller in court as the man Mary evicted from her home, who thereafter returned and whose voice she heard during a knock on the door, immediately after which she heard Mary being brutally attacked. Heller's cousin, Kevin, also identified Heller as the individual he left at Mary's trailer with Mary, Tracy, and Chino prior to the attack, as the person who Tracy indicated to him had "snapped" and as the person who

called him the next evening needing a ride from the area near the crime scene. Finally, Heller admitted in his statement that he and "a white girl" were dropped off at a trailer by Kevin, there was "a white lady and a Mexican man" inside the trailer, that the lady who lived there told him he had to leave the trailer, and he started stabbing people upon his return. Thus, there was overwhelming evidence presented of Heller's guilt. Further, an abundance of evidence was presented concerning Heller's participation in illegal drug activity such that the admission of Heller's prior drug convictions was cumulative to the other evidence. Tracy testified that Heller accompanied Kevin when Kevin "served" them drugs on the night in question, and that Heller smoked crack with them that night. Mary also confirmed that Heller participated in smoking crack that night and further indicated that she paid Heller for the drugs after Heller and Tracy argued over drugs and money. Accordingly, even if we assumed error in the admission of Heller's prior drug convictions, any such error was insubstantial and could not reasonably have affected the result of the trial. Thus, Heller can show no prejudice, and any error in admission of the drug convictions was harmless. *See State v. Johnson*, 363 S.C. 53, 60, 609 S.E.2d 520, 524 (2005) (finding the introduction of prior convictions was not prejudicial where other evidence was admitted concerning defendant's possible guilt relating to other crimes, and because there was overwhelming evidence of defendant's guilt in the matter, the introduction of his prior convictions could not have reasonably affected the outcome of the trial such that any error was harmless).

## B. Mention of "parole leave"

■ During Kevin's direct examination concerning Heller's whereabouts that night, Kevin explained that he called his mother after he picked up Heller, they met his mother at a Burger King, and Heller got in the van with Kevin's mother to go to Lexington for the night. The following colloquy then occurred:

A: I think they left like either a day—I think a day after she picked him up from me.

Q: Okay. They leave to go where?

A: To Baxley.

Q: Back to Baxley—

A: Yes.

Q: —Georgia?

A: Because he was here on like a parole leave. He had a certain amount of time until he had to be back.

At this point, trial counsel objected and moved to strike. The trial court sustained the objection and instructed the jury to "[d]isregard his comment about the parole." The solicitor finished examining Kevin, at which point the trial court decided to take a fifteen minute break. After the jury left the courtroom, trial counsel asked to put a matter on the record and moved for a mistrial based upon Kevin's mention that Heller was on parole. Counsel argued he had filed a pretrial motion so witnesses would be instructed not to bring up Heller's parole.[4] He further argued the court's curative instruction, striking the matter from the record, was an insufficient remedy. The court noted that the statement was "just spontaneous" and Kevin had "just blurted it out." The solicitor agreed, asserting the statement was nonresponsive to her question. The solicitor further argued "it was a small comment" and the court had instructed the jury to disregard it. The trial court denied Heller's motion for mistrial.

Heller argues the mention of him being on parole clearly showed he had a prior criminal record. He asserts that admission of evidence implying a defendant has a prior criminal record is reversible error, and the trial court's instruction to the jury to disregard the reference to parole was insufficient to cure the prejudice. Heller further contends this situation should not be considered one where there is a vague reference to a defendant's prior criminal record such that it would not justify a mistrial because, here, the solicitor knew she was going to attempt to impeach him with his prior drug convictions at the time she argued against the mistrial motion. Consequently, it was not a vague and isolated reference. Accordingly, Heller contends the trial court erred by refusing to declare a mistrial.

---

4. No such motion is included in the record, nor does the transcript show such a motion was ever addressed by the trial court.

Where a defendant receives the relief requested from the trial court, there is no issue for the appellate court to decide. *State v. Parris,* 387 S.C. 460, 465, 692 S.E.2d 207, 209 (Ct.App.2010). "No issue is preserved for appellate review if the objecting party accepts the judge's ruling and does not *contemporaneously* make an additional objection to the sufficiency of the curative charge or move for a mistrial." *State v. George,* 323 S.C. 496, 510, 476 S.E.2d 903, 912 (1996) (emphasis added). Although Heller subsequently moved for a mistrial, he initially accepted the trial court's ruling wherein the trial court sustained his objection and granted his requested relief of striking the offending testimony. Because he accepted the ruling and did not contemporaneously move for a mistrial or object to the sufficiency of the court's curative instruction, this issue is not preserved for our review. Further, though Heller did move for a mistrial and argue the curative instruction was insufficient immediately following conclusion of the State's direct examination of Kevin, this is insufficient to qualify for a contemporaneous objection. *See State v. Simmons,* 384 S.C. 145, 171–72, 682 S.E.2d 19, 32–33 (Ct.App.2009) (wherein this court found unpreserved Simmons' appellate argument that the trial court erred in denying his motion for a mistrial in response to testimony of a witness referencing the robber as "the defendant," where Simmons failed to make a timely objection in response to the witness's statement, instead waiting until after the witness finished testifying before he objected and requested a mistrial).

### C. In camera hearing on voice identification

During direct examination, Tracy testified concerning the events leading up to the stabbing of Mary. Specifically, in regard to what occurred after Kevin and Devon departed, leaving Tracy, Mary, Chino, and Heller at the trailer, Tracy stated that the remaining group smoked crack. According to Tracy, Heller was acting strangely, prompting Mary to ask him to leave. Tracy stated that Heller "gave [her] the creeps," and "he tried to follow [her] out." Heller initially complied with Mary's request and left the trailer, but returned three to five minutes later. Thereafter, Chino left to get a phone, as Mary and Tracy wanted Kevin to come pick up Heller. Only Tracy and Mary remained at the trailer at that

time. When asked what she and Mary were doing, Tracy testified, "Well, we were trying to sit down and have a conversation, but somebody knocked on the door. It was him. I heard his voice." Trial counsel objected to Tracy's identification of the voice and moved to strike the testimony, arguing her identification based on the voice had never been addressed before and was not brought up in pretrial hearings. At this point, a bench conference was held off the record, and the trial court thereafter sustained trial counsel's objection. When Tracy's testimony resumed before the jury, the solicitor questioned her concerning her opportunity to talk with Heller and hear his voice on the night of the incident. Tracy testified that she talked with Heller "a little" that night; heard his voice; described it as raspy and deep; and stated she could recognize his voice if she heard it again. The following colloquy then occurred:

Q: So that night when someone came and knocked on the door, did the person say anything.

A: I don't know what exactly he said. I just heard—I just heard her saying, "No, no," and I heard him say something, and then I heard a whole lot of noise—

Q: Like—

A: —like banging, like (indicating).

Q: Did the voice belong to a man or a woman?

A: A man.

Q: And could you identify that voice?

A: Yes.

Q: And who was that voice belonging to?

[Defense Counsel]: Objection, Your Honor.

[The Court]: Overruled. Go ahead.

A: I would say him.

Q: The defendant?

A: Uh-huh, without a doubt.

When Tracy heard that voice, she told Mary not to open the door, but Mary told her to just shut the bedroom door. When Tracy heard banging and screaming, she then locked the door and hid under the bed. Tracy thereafter made an in-court identification of Heller as the man she heard come into the trailer while she was in the bedroom. During cross-examina-

tion, trial counsel questioned Tracy extensively regarding her failure to mention anything about hearing a voice at the front door that night in either her statement to police or in her pretrial testimony. Tracy acknowledged she did not see the attack, but stated she heard it. She also noted Mary had kicked Heller out only three minutes before the knock on the door, and questioned, "Who else would it have been?"

Sometime thereafter, trial counsel stated he wanted to place on the record that, during the bench conference, he had requested an in camera hearing, in the vein of a *Neil v. Biggers* hearing, to cross-examine Tracy on her voice identification outside the presence of the jury. The trial court acknowledged that a request had been made for an in camera hearing, which the court denied. The court noted it had initially sustained the objection to the testimony, but allowed the prosecution the opportunity to lay the foundation for Tracy's voice identification. Once the foundation was properly laid and an objection was made, the court overruled the objection. At the close of the State's case, trial counsel renewed his previous objections and motions, specifically noting he had requested an in camera hearing regarding Tracy's voice identification "[a]ccording to *Neil v. Biggers.*"

On appeal, Heller argues the trial court erred in refusing to grant his motion for an in camera hearing on the admissibility of Tracy's voice identification testimony. He asserts Tracy was improperly allowed to give this testimony because there was insufficient foundation for it, and because South Carolina law concerning the admission of voice identification evidence indicates a trial judge should establish some foundation for the admissibility of such evidence. He contends Tracy's voice identification was "very suspect," noting Tracy first met Heller on the night of the incident, and she "was in another room." Thus, Heller maintains the trial court should have allowed an in camera hearing to determine if there was a proper foundation for Tracy's voice identification. Heller additionally cites the California case of *People v. Clark,* 3 Cal.4th 41, 10 Cal.Rptr.2d 554, 833 P.2d 561 (1992), for the proposition that the trial court erred in failing to hold an in camera hearing on the voice identification evidence.

 We find no merit to this issue. In *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court addressed whether a show-up identification was so suggestive that it violated the defendant's right to due process. *Id.* at 196–201, 93 S.Ct. 375. In *State v. Traylor,* 360 S.C. 74, 600 S.E.2d 523 (2004), our supreme court noted "[t]he United States Supreme Court has developed a two-prong inquiry [5] to determine the admissibility of an *out-of-court identification.*" *Id.* at 81, 600 S.E.2d at 526 (citing *Biggers* ) (emphasis added). Our courts now consistently recognize the general rule that a trial court must, when identification of a defendant is an issue, hold an in camera hearing "when the State offers a witness whose testimony identifies the defendant as the person who committed the crime, *and the defendant challenges the in-court identification as being tainted by a previous, illegal identification or confrontation.*" *State v. Miller,* 359 S.C. 589, 596, 598 S.E.2d 297, 301 (Ct.App. 2004) (emphasis added), *aff'd,* 367 S.C. 329, 626 S.E.2d 328 (2006). Our courts have refused, however, to extend the requirements of a *Biggers* hearing to protect criminal defendants against identifications that occur for the first time in court, without a pretrial identification. *State v. Lewis,* 363 S.C. 37, 42–43, 609 S.E.2d 515, 517–18 (2005).

 In the case at hand, it is undisputed that Tracy's voice identification occurred for the first time in court. Heller did not challenge the voice identification by Tracy as being suggestive or in any way tainted by a previous, illegal identification or confrontation. Thus, a *Biggers* hearing was not warranted in this case.[6] Further, Heller fails to point to any

---

5. Under this inquiry, the court must first determine whether the identification process was unduly suggestive and, next, must determine whether the out-of-court identification was nevertheless so reliable that no substantial likelihood of misidentification existed. *State v. Moore,* 343 S.C. 282, 287, 540 S.E.2d 445, 447 (2000). Only if the procedure was suggestive need the court consider whether there was a substantial likelihood of irreparable misidentification. *Id.* at 287, 540 S.E.2d at 447–48.

6. Heller's reliance on the California Supreme Court case of *People v. Clark,* for the proposition that the trial court erred in failing to hold an in camera hearing on the voice identification evidence, is equally misplaced, as that case involved an in camera hearing wherein a voice identification was challenged as impermissibly suggestive based upon

authority that requires an in camera hearing to address whether a proper foundation exists for testimony concerning an in-court, first time, voice identification.[7] Additionally, the record clearly shows the trial court initially sustained Heller's objection to Tracy's in-court voice identification, and only after the solicitor laid a proper foundation did the trial court allow the voice identification into evidence.[8] Accordingly, we find no error.

## CONCLUSION

Based on the foregoing, we find, although the trial court failed to make an on-the-record *Colf* analysis, any possible error in the admission of Heller's prior convictions was harmless nonetheless. Additionally, the issue concerning the mention of Heller being on "parole leave" by the witness is not preserved for our review. Finally, we hold a *Biggers* hearing was not required on the voice identification because Heller did not challenge the voice identification as being based upon an inherently suggestive out of court proceeding, and a proper foundation was laid for the admission of the testimony.

**AFFIRMED.**

FEW, C.J., and SHORT, J., concur.

---

an inherently suggestive single-voice lineup in an out of court proceeding.

7. Rule 104(c), SCRE, provides that "[h]earings on the admissibility of . . . pretrial identifications of an accused shall in all cases be conducted out of the hearing of the jury," and "[h]earings on other preliminary matters shall be so conducted when the interests of justice require, or when an accused is a witness and so requests." However, Heller has not cited this rule, either at trial or on appeal, and additionally has presented no argument whatsoever that "the interests of justice require" an in camera hearing on the matter.

8. We note that Heller did not specifically challenge the foundation for the voice identification as inadequate at trial, but simply argued that he was entitled to an in camera hearing to cross-examine Tracy on the voice identification. At any rate, we believe a sufficient foundation was laid, as Tracy testified concerning her opportunity to hear Heller's voice earlier that night, she gave a description of his voice as being raspy and deep, and she confirmed she could recognize his voice if she heard it again.