600 S.E.2d 523

**The STATE, Petitioner/Respondent,**

v.

**Luke TRAYLOR, Respondent/Petitioner.**

**No. 25847.**

Supreme Court of South Carolina.

Heard June 22, 2004.

Decided July 26, 2004.

Katherine Carruth Link and South Carolina Office of Appellate Defense, of Columbia, for Respondent–Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Melody Brown, all of Columbia; and Solicitor Thomas Pope, of York, for Petitioner–Respondent.

Justice WALLER:

We granted cross-petitions for certiorari to review the Court of Appeals' opinion in *State v. Traylor*, Op. No.2003–UP–036 (Ct.App. filed Jan. 14, 2003). We reverse.

## FACTS

In the early morning hours of May 17, 2000, the York County home of Marcos Rivera, Alfredo Garcia, and Javier Cervantes was burglarized. The men awoke and found themselves being beaten, stabbed and robbed. After the attack, Detective Sarah Robbins of the York County Police Department was called to the scene.[1] Two of the men, Alfredo and Javier, described their attackers as three black males and one white male. Marcos remembered seeing only two black males and one white male. Javier recognized one of the black male assailants, ultimately determined to be Willie Hayes, as living in a nearby home. Hayes was arrested and identified Luke Traylor as one of his accomplices.[2]

Robbins testified that each of the victims identified the white male assailant as being tall and slim and wearing a cap. One of the victims believed the white male was sixteen or seventeen years old. None of the victims gave any specific description as to the white male's hair or eye color.[3]

Two days later, Javier, Marcos and Alfredo went to Robbins' office at the police department. Robbins put together three separate groups of photographs, each containing 5–6 photos of different individuals; each set contained one photo of an individual identified by Hayes. The photos of Traylor (as well as the other accomplices), were all photos which had been processed after their arrest for this crime. Unlike the photos of the other four individuals in the group containing Traylor's photo, his photo does not have a sign beneath it showing an arrest date, and stating "Police Department— York, South Carolina."[4] Additionally, all of the photos shown

---

1. Robbins was called because the men spoke only Spanish, a language in which she is fluent.

2. Hayes also identified two other accomplices.

3. Robbins testified victims did not specifically tell her a height of the white male, but that they somehow indicated an approximate height, and she wrote down 5'6"–5"8."

4. According to Robbins, the sign attached to the camera pole had been broken and had been removed.

to the victims have numerical markings on the side, indicating a height in inches.[5]

Robbins testified that during the photographic line-up, the victims sat behind her desk in a semi-circle, several feet apart. She testified each victim was separately handed a group of pictures, and asked whether he could identify an assailant. Each victim would then hand the group of photos back to her, and indicate which person, if any, he recognized. During this time, there was no conversation between the victims as to who had been identified.

Each of the photographs shown to the victims had a name on the back; however, Robbins stated the victims did not turn the photos over and look at the back of them. Further, although the victims had been told someone had been arrested, there is no indication they were aware of the identity or number of individuals arrested.

Marcos Rivera testified that he, Alfredo, and Javier were all sleeping in the same bedroom when he woke up and realized he had been cut on the side of his head. He saw a white male and two black males. The black male beside him had a knife. Marcos was holding the hand of the black male (who had stabbed him) when the white male, who was wearing a cap, came over and hit his hand with a stick. The black male then cut him again. Marcos said the white male was in the bedroom for a total of twenty to thirty minutes, and that he was able to see the white male for approximately ten minutes.[6] Marcos testified that the man who had cut him with a knife was the taller, black male, while the shorter black male had an afro-type hairdo. After leaving the hospital several hours later, Marcos went to the police station where he identified a photograph of the man with the afro hairdo.[7] Two days later, he went to Robbins' office and was shown three sets of photos; the only photo he could identify (other than the photo of Hayes whom he had previously identified) was that of the

---

5. Traylor's photo shows him to be approximately 70.5 inches tall, or about 5'10 & 1/2." Robbins testified that the victims indicated the white male was approximately 5'6"–5'8."

6. · After this point, the assailants told the victims to cover their heads.

7. This was a photo of Willie Hayes, who initially implicated Traylor.

white male, Traylor. Marcos testified he did not notice any writing at the bottom of the photos, and he did not say anything to Javier or Alfredo about what he had seen in the pictures.

Alfredo testified that when he woke up, the lights were on and he was being beaten with a stick by a white male who was wearing a cap. He was able to see him for about a minute. He testified he initially also saw two black males. He later saw a third black male with a white shirt. After the assault, Alfredo was able to identify a photo of a black male with an afro-style hairdo and a black shirt. Two days later, Alfredo went to Robbins' office and picked a photo of Traylor as the white male assailant.[8] He testified he knew the young blond man in the photo was the assailant "because of his face, his thin face and body. And even though that night he wore a cap, I was able to recognize him." Alfredo testified that, during the line-up in Robbins' office, Marcos viewed the photos first, then Alfredo, then Javier; he testified he did not know whom Marcos had identified at the time he viewed the photos.

Javier testified he was sleeping on the sofa when he woke up and saw three men in the room: two black males and one white male. The lights were on and the white male, who was standing near him, had a cap on, a stick in his hand, and was hitting them with the stick. Javier was able to look at him for about five minutes. Although the white male was in the room for twenty or thirty minutes, he didn't see him the whole time as the man covered him with a bed cover. Javier recognized one of the black males, with an afro-style hairdo, as a man he had seen before. Javier then saw a third black male at the door with a white t-shirt. After the assault, Javier went with Robbins to show her the home where he had seen the black male with the afro hairdo. Two days later, he went with Marcos and Alfredo to Robbins' office, where they looked at the photographic line-up prepared by Robbins. Javier testified the photos were first viewed by Marcos, then Alfredo, then himself. He testified he did not know, when he received the photos, whose pictures Marcos and Alfredo had picked

8. He also picked out a photo of the black male who had cut Marcos with a knife, and another black male.

80

from the line-up. Javier also identified the photo of Traylor as the white male assailant.[9] Javier did not notice any writing on the bottom of the photos when he viewed them.

Traylor moved to suppress the victims' identification on the basis that the pre-trial photo identification was tainted. Specifically, he alleged 1) the fact that the three victims were sitting together in Robbins' office when they made the identification had the "potential of tainting" the lineup, 2) the name of each defendant was visible on the back of the photographs, 3) Traylor's photograph was different than the other white males in his group because it did not have a date on the bottom, nor did it state "Police Department–York County," and 4) the fact that the photographs reflect the height of the individuals is impermissibly suggestive. The state conceded that, ideally, the victims should have been shown the lineups separately, but nonetheless maintained the procedure used was not impermissibly suggestive, and the identification was reliable. The trial court, after reviewing the totality of the circumstances, denied the motion to suppress.

Thereafter, the trial judge inquired as to how the state intended to handle the issue before the jury, due to the fact that the photo of Traylor was clearly a mug shot, revealed by the front and side poses, and the height indicators. The court ruled the only way the state would be permitted to introduce the photos before the jury was to redact them, so that the height lines would no longer be visible. However, counsel for Traylor interjected that if the photographs were redacted, then the jury would be shown photographs which were different than those shown to the victims; accordingly, counsel maintained that the cleaned up photos would actually prejudice Traylor more than the unredacted photos, such that the photos should not come into evidence at all. He then asserted that, if the photos used in the lineup were to be admitted at all, he would prefer the originals to the redacted version. After being given an opportunity to confer with Traylor, counsel concluded it was less prejudicial for the unredacted photos to be admitted than the redacted ones. Accordingly, the trial court admitted the unredacted mug shot photos before the jury.

---

9. He also identified a photo of the black male who cut Marcus.

On appeal, Traylor argued the photographic lineup was unduly suggestive and unreliable, and that the photos should not have been admitted. The Court of Appeals held the photographic lineup procedure used in this case was unduly suggestive, and the resulting identification was unreliable. Accordingly, it reversed and remanded.

## ISSUES

1) Did the Court of Appeals err in holding the photographs lineup procedure used in this case was unduly suggestive and unreliable?
2) Did the trial court err in ruling the photos used in the lineup were admissible?

## 1. PHOTOGRAPHIC LINEUP PROCEDURE

■■■■ A criminal defendant may be deprived of due process of law by an identification procedure which is unnecessarily suggestive and conducive to irreparable mistaken identification. *State v. Moore*, 343 S.C. 282, 540 S.E.2d 445 (2000). An in-court identification of an accused is inadmissible if a suggestive out-of-court identification procedure created a very substantial likelihood of irreparable misidentification. *Id.* The United States Supreme Court has developed a two-prong inquiry to determine the admissibility of an out-of-court identification. *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). First, a court must ascertain whether the identification process was unduly suggestive. The court must next decide whether the out-of-court identification was nevertheless so reliable that no substantial likelihood of misidentification existed. *Moore*, 343 S.C. at 288, 540 S.E.2d at 448. "The central question is whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *State v. Stewart*, 275 S.C. 447, 450, 272 S.E.2d 628, 629 (1980).

■■■ We find the line-up procedure utilized in this case was patently suggestive. To bring three victims into the same room, within several feet of one another, is blatantly unacceptable. There is simply no need for such a procedure, and we strongly admonish the state against utilization of simultaneous viewings in the future. However, notwithstanding the sugges-

tiveness of the line-up in this case, we simply cannot conclude it gave rise to a substantial likelihood of irreparable misidentification.

Even assuming an identification procedure is suggestive, it need not be excluded so long as, under all the circumstances, the identification was reliable notwithstanding the suggestiveness. The inquiry must focus upon whether, under the totality of the circumstances, there was a substantial likelihood of irreparable misidentification. *State v. Moore*, 343 S.C. at 287, 540 S.E.2d at 447–48, *citing Jefferson v. State*, 206 Ga.App. 544, 425 S.E.2d 915, 918 (1992). The following factors should be considered in evaluating the totality of the circumstances to determine the likelihood of a misidentification: (1) the witness's opportunity to view the perpetrator at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the perpetrator, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *State v. Cheeseboro*, 346 S.C. 526, 541, 552 S.E.2d 300, 308 (2001), *cert. denied* 535 U.S. 933, 122 S.Ct. 1310, 152 L.Ed.2d 219 (2002).

As noted previously, Robbins testified the victims were seated several feet apart from one another, and she individually handed them sets of 4–5 photos, which each would look at and hand back to her. There was no conversation between them while they were observing the photos, and they did not turn the photos over and look at the names on the back. Further, each of the victims testified as to the procedure utilized. Marcos testified that he did not notice any writing on the front of the photos,[10] and that he did not say anything to Alfredo or Javier as to what he saw in the photos. Alfredo testified that in looking at the photos in Robbins' office, Marcos looked at them first, then he did, then Javier did; he did not know who Marcos had picked out of the pictures when he looked at the photos. Alfredo picked out the photos of Traylor, Hayes, and one of the other black males. Javier testified he did not know, when he received the photos, whose pictures Marcos and Alfredo had picked out. Javier also identified the photo of Traylor as the white male assailant, as

---

**10.** As mentioned previously, none of the victims spoke English.

well as a photo of Hayes as the assailant who had cut Marcus. Javier did not notice any writing on the bottom of the photos.

The victims testified they were able to view the white male assailant anywhere from one minute (Alfredo), five minutes (Javier), and ten minutes (Marcos), with the lights on. Although they did not give a hair or eye color (the assailant had a cap on), they told Robbins he was tall, slim, and young. Further, although they did not specifically describe his clothing (other than the cap), they testified before the jury that they had all seen his face. Clearly, this testimony demonstrates their attention was focused on his face. The next factor is the accuracy of their description. The victims all described the white male as being tall and slim, which is an accurate description of Traylor. Further, although Traylor has a fairly distinctive looking face due to the fact that it is quite long and slim, there is no specific distinguishing feature such as moles, mustache, bushy brows, deep-set eyes, or the like. The fourth factor is the witnesses' level of certainty; all three victims were quite certain of their identification in this case. And, finally, the identification of Traylor was made two days after the incident, clearly weighing in favor of its reliability.

In sum, although we cannot condone the manner in which the photographic line-up in this case was performed, there is simply not a substantial likelihood of irreparable misidentification, such that the trial court properly allowed the identification.[11] Accordingly, the Court of Appeals' holding on this issue is reversed.

## 2. ADMISSIBILITY OF LINE–UP PHOTOS

■ Traylor also asserts the trial court committed reversible error in admitting the mug shots into evidence.

---

11. *Accord State v. Anderson,* 517 So.2d 1231 (La.App.1987) (although photographic identification by two victims simultaneously was highly suggestive, it did not taint subsequent physical identification); *Commonwealth v. Moynihan,* 376 Mass. 468, 381 N.E.2d 575 (1978) (although it would have been preferable for victims to make their photographic selections independently, simultaneous viewing and selection did not require suppression of identification in light of favorable conditions under which robbers were viewed and the short amount of time that elapsed between robbery and photographic identification).

■ The introduction of a "mug-shot" of a defendant is reversible error unless: (1) the state has a demonstrable need to introduce the photograph, (2) the photograph shown to the jury does not suggest the defendant has a criminal record, and (3) the photograph is not introduced in such a way as to draw attention to its origin or implication. *State v. Tate*, 288 S.C. 104, 341 S.E.2d 380 (1986); *State v. Robinson*, 274 S.C. 198, 262 S.E.2d 729 (1980); *State v. Denson*, 269 S.C. 407, 237 S.E.2d 761 (1977).

We find no demonstrable need to introduce the photo lineup in this case. The State's assertion that it could not credibly show Traylor was in the house without the photo line-ups is untenable. Detective Robbins testified that Javier identified a man named Willie Hayes, whom he had seen before in the neighborhood, as one of the assailants. Hayes was arrested and identified Traylor as one of his accomplices. Hayes was called as a witness for the State, and testified Traylor was at the scene of the crime. Each of the victims testified at trial, and described the attack, as well as the assailants. The State could very easily have questioned the victims as to their observations of the white male assailant at the time of the crime, his tall thin frame and thin face, in order to support their in-court identifications without resort to the photo line-up. Accordingly, admission of the mug shots was error.

■ However, Detective Robbins testified before the jury that the photograph of Traylor which she showed to the victims during the line-up was taken upon his arrest. Further, counsel for Traylor specifically cross-examined Robbins regarding the fact that Traylor's photo did not have a date on the bottom because it had been taken shortly after his arrest on these charges. Accordingly, although we strongly admonish the state against utilization of such photos except in the rarest of cases, we find no prejudice to Traylor as a result of the photographs in this case, such that his convictions are affirmed.[12] *State v. Locklair*, 341 S.C. 352, 535 S.E.2d 420

---

12. Although we have held admission of a mug-shot to be reversible error if the three criteria of *State v. Denson*, 269 S.C. 407, 237 S.E.2d 761 (1977) are not met, the rationale for this holding is that such photos are prejudicial because they imply a defendant's prior bad acts. Here, however, the photograph was explained in such a manner that it did not imply Traylor had committed prior bad acts.

(2000), *cert. denied* 531 U.S. 1093, 121 S.Ct. 817, 148 L.Ed.2d 701 (2001) (error without prejudice does not warrant reversal).

## CONCLUSION

We strongly admonish the state against the use of simultaneous line-up procedures; victims should be individually shown a line-up, and individual identifications made. Further, we fervently caution trial court judges against utilization of mug shot photos unless absolutely necessary. Under the precise facts of this case, however, we find the suggestive procedure did not irreparably taint the victims' identifications, and admission of the mug shot photo was not prejudicial to Traylor. Accordingly, the Court of Appeals' opinion is reversed.

**REVERSED.**

TOAL, C.J., MOORE, PLEICONES, JJ., and Acting Justice APHRODITE K. KONDUROS, concur.