MCDONALD, J.:
**5 Archie More Hardin appeals his convictions arising from the armed robbery of an Orangeburg T-Mobile store, arguing the circuit court erred in (1) denying his motion for a continuance; (2) concluding the out-of-court identifications made by the victims were sufficiently reliable despite law enforcement's unduly suggestive procedure; and (3) admitting evidence collected in a second search of Hardin's apartment. We affirm.
Facts and Procedural History
On the morning of May 16, 2014, Hardin entered a T-Mobile store on St. Matthews Road in Orangeburg, where he spoke with employee Jarron Weaver about purchasing an iPad. Hardin left the store to make a phone call, reentered a few minutes later to discuss a credit check for the purchase, and left again. Shortly thereafter, two armed and disguised men entered the store and held Weaver and store manager, Thomas Sims, Jr., at gunpoint. The armed men directed Weaver and Sims to the back room, forced them to the floor, bound their hands and feet with duct tape, and threatened to shoot them if they looked up. One of the armed men found employee Kirstie Berry outside-he punched her in the face, pulled her into the store, pistol whipped her, and duct-taped her hands and feet. After stealing cell phones and other electronics, including Sims's personal iPad, the men exited the rear of the store; two **6 witnesses saw them jump a fence and drive away in a gray, four-door Toyota sedan.
Using the "Find My iPad" application, the Orangeburg County Sheriff's Office (OCSO), the Richland County Sheriff's Office, and the City of Columbia Police Department (CCPD) collaborated to locate the stolen iPad. Investigator Elizabeth Schumpert of the OCSO relayed the location information to Corporal Leonard Cain, who tracked the iPad around Columbia. Cain first spotted the suspected getaway car at the Budget Inn on Sunset Boulevard, where he witnessed "an individual with a blue shirt on come outside of the hotel lobby door and get inside the vehicle." Cain watched the car "make a right turn on the side of the hotel building.... [a]nd then saw two individuals a few minutes later peeking their heads around the corner looking at [Cain]." Eventually, Cain met up with CCPD Investigator Darius Wade, and they followed the iPad track until it ended at an apartment complex on Bentley Court in Columbia.
When they arrived at the apartment complex, Cain, Wade, and other CCPD officers found Hardin walking to a vehicle matching the description of the Toyota sedan used as the getaway car in the T-Mobile robbery. Hardin admitted he rented the car but *180 claimed to have loaned it to his friend "Black" earlier that day. Hardin also stated that he and Black saw Cain at a gas station "at Edison and Beltline Boulevard" and thought Cain was Black's probation officer. The officers frisked Hardin, whom they found to be unarmed, and told him they were looking for a stolen iPad and a "black male, 5'10?[,] 190 to 200 pounds, [who] walks with a limp." Hardin gave written consent for the officers to search his person and his apartment.
Law enforcement first conducted a perimeter sweep of Hardin's apartment. When officers were unable to locate the iPad inside the apartment using the "play music" function, they searched outside and found the device in a plastic bag near a dumpster "about a hundred yards" from Hardin's building. Hardin claims the officers subsequently demanded that he re-sign the consent to search, which the officers had amended to include "any firearms, handguns." Hardin refused to re-sign. During a more comprehensive search of Hardin's **7 apartment, the officers found a box of cell phones and two guns matching the description of those used in the robbery. Hardin told the officers the items belonged to Black and offered to help find him.[1]
While other police officers were searching for the stolen iPad, Cain texted a photograph of Hardin to Schumpert, who was still on scene at the Orangeburg T-Mobile; Schumpert showed the photo to the three employee victims. Despite their varying descriptions of the suspects' clothing, the victims positively identified Hardin as one of the armed robbers.
On September 3, 2014, the Orangeburg County Grand Jury indicted Hardin on three counts of kidnapping and one count each of armed robbery, assault and battery of a high and aggravated nature (ABHAN), and possession of a weapon during the commission of a violent crime.
On February 23, 2015, the circuit court heard Hardin's motions for a continuance, to suppress the evidence found in his apartment, and to exclude the victims' out-of-court identifications of the texted photograph. The court denied Hardin's pretrial motions and his subsequent motion for a directed verdict. Following the three-day trial, the jury found Hardin guilty of all charges. The circuit court denied Hardin's post-trial motions and imposed concurrent sentences of thirty years' imprisonment for armed robbery and each count of kidnapping, and twenty years' imprisonment for ABHAN. As to Hardin's charge for possession of a weapon during the commission of a violent crime, the court sentenced him to five years' imprisonment, to run consecutive to the other sentences.
Law and Analysis
I. Motion for a Continuance
Hardin sought a continuance before his trial, which was set to begin on February 23, 2015, asserting that until February 17, 2015, it was his understanding that the State had sent certain DNA evidence and latent fingerprints to the South Carolina Law Enforcement Division (SLED) for testing.
**8 Citing State v. Langford , 400 S.C. 421, 735 S.E.2d 471 (2012)[2] and Holmes v. South Carolina , 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006),[3] Hardin argued he was *181 entitled to the continuance because (1) the State utilized its unconstitutional control of the docket to schedule his trial before forensic evidence had been tested, and (2) the State's denial of access to the DNA evidence for testing effectively hindered his fundamental right to prepare and present a full and complete defense, including a potential defense of third-party guilt. In response, the State argued the DNA taken from the Toyota and the firearms seized from Hardin's apartment could not possibly exculpate him because his co-defendant had not yet been apprehended. The State further argued it was proper that it controlled the docket in Hardin's case because the case was less than a year old. The circuit court ultimately denied Hardin's continuance motion.
Hardin argues the circuit court erred in declining to continue the trial because the DNA evidence the State failed to submit for analysis to SLED-and which he sought to have his expert examine-was possibly exculpatory in nature. Relying on State v. Tanner , 299 S.C. 459, 385 S.E.2d 832 (1989), Hardin contends he made more than the required showing that he could have introduced additional relevant evidence had he been given more time. Because of the nature of the **9 evidence at issue here, we find Hardin's reliance on Tanner misplaced.
In Tanner , the defendant was arrested and charged with three counts of felony driving under the influence. 299 S.C. at 460, 385 S.E.2d at 833. Following the accident, law enforcement collected DNA samples from Tanner's vehicle. Id. at 462, 385 S.E.2d at 834. Although Tanner may have become aware of the existence of these samples prior to trial, the State informed him they were lost or misplaced in response to at least six inquiries and a discovery motion. Id. Nevertheless, SLED brought the untested DNA samples to court, where the State informed Tanner of their availability ten minutes before the pretrial hearing. Id. Tanner moved for a continuance to either conduct an independent examination of the DNA samples or wait for SLED to complete an analysis. Id. The circuit court ruled the State could not use the samples in its case but denied Tanner's request for a continuance. Id. Our supreme court reversed, holding the circuit court erred in failing to consider the potential exculpatory value of the DNA samples because "the defendant has satisfied the Squires criteria of demonstrating other evidence that could have been produced[ ] and other points in his behalf that could have been raised." Id.
The untested evidence in this case differs from that in Tanner . Here, the DNA evidence was not critical to the issue of Hardin's guilt or innocence. The three employee victims never claimed one perpetrator acted alone; all testified that two armed and disguised men held them at gunpoint, bound their hands and feet with duct tape, and robbed the store. At least one of the suspects is still at large, and the State repeatedly emphasized it did not submit the DNA evidence for analysis because it is "SLED's policy" not to analyze such evidence if one suspect is in custody while another remains at large.[4] Law enforcement recovered two firearms from inside Hardin's apartment and collected DNA from the Toyota sedan, which Hardin admittedly rented and allegedly loaned to **10 Black. Thus, the DNA evidence-from a rental car likely occupied by many individuals over time-could not have exculpated Hardin. The results of properly testing such evidence could only be neutral or possibly even inculpatory.
The primary defense in Tanner was that the defendant was not the driver at the time of the accident. Thus, any evidence of the victim's hair or blood on the driver's side of the vehicle could have supported Tanner's contention that he was merely a passenger. Here, however, Hardin failed to show how the presence or absence of his DNA in the rented Toyota or on the guns could have actively supported his third-party guilt defense when his co-defendant was still at large.
*182 Law enforcement also collected fingerprints from a Nexus box,[5] an iPhone, and the rental car; however, under direct comparison, these prints did not match Hardin's.[6] Like the DNA, the State did not submit for analysis any of the duct tape used to bind the victims' hands and feet. But because the victims testified the robbers were wearing gloves, we agree with the circuit court that any latent fingerprints or "touch DNA" on the tape could not have been helpful to Hardin's defense.[7]
"The trial court's denial of a motion for a continuance will not be disturbed on appeal absent a clear abuse of discretion." State v. Wrapp , 421 S.C. 531, 535, 808 S.E.2d 821, 823 (Ct. App. 2017). "Where there is no showing that any other evidence on behalf of the [defendant] could have been produced, or that any other points could have been raised had more time been granted for the purpose of preparing the case for trial, the denial of a motion for continuance is not an abuse of discretion."
**11 State v. Williams , 321 S.C. 455, 459, 469 S.E.2d 49, 51-52 (1996). Under our deferential standard of review, we cannot say the circuit court erred in denying Hardin's request for more time to examine the evidence or in finding Hardin was not prejudiced by the solicitor's handling of the evidence and setting the case for trial. See Langford , 400 S.C. at 436, 735 S.E.2d at 479 (explaining the "determination that section 1-7-330 violates separation of powers is not dispositive.... To warrant reversal, [a defendant] must demonstrate that he sustained prejudice as a result of the solicitor setting when his case was called for trial").
II. Suggestive Identification Procedure
Hardin argues the circuit court erred in concluding that despite the unduly suggestive identification procedure, the victims' out-of-court identifications were nevertheless so reliable that no substantial likelihood of misidentification existed. We agree the procedure was unduly suggestive, but find any error in admitting the photo identifications was harmless.
Testimony established that while other officers were searching for the stolen iPad, Corporal Cain photographed Hardin standing in front of a uniformed officer[8] and texted the photograph to another OCSO deputy, who showed it to the victims still on-scene at T-Mobile. Despite their varying descriptions of the suspects, the victims positively identified Hardin as one of the assailants when they viewed the texted photo. The circuit court concluded Hardin carried his burden of proving the identification procedure was impermissibly suggestive. However, after evaluating the reliability of the identifications under the totality of the circumstances, the circuit court found the out-of-court identifications admissible as there was no substantial likelihood of misidentification.
At the pretrial hearing, the victims provided detailed descriptions of their assailants. Sims testified he was able to view Hardin for five to ten minutes before he left T-Mobile the first time; he then saw Hardin briefly return, leave again, and come in a third time with another man, both of whom were disguised and carrying guns. Sims described the guns as "revolvers"-one was "old looking" and "rusty" and the other was "newer"-and stated Hardin was wearing "sunglasses, a **12 black hat, a black shirt, and khakis." Sims was immediately able to identify Hardin in the State's photograph as one of the men who robbed the store. In his statement to police, Sims noted the second robber was the shorter of the two, had a stocking over his face, and wore sunglasses; however, on cross-examination, Sims admitted the second robber was not wearing sunglasses. *183 Weaver testified he talked with Hardin, face-to-face, for ten to fifteen minutes when he first came into T-Mobile, and then again for another five to ten minutes when he returned. Hardin had on a baseball cap and sunglasses. Weaver acknowledged that in his statement to police, he also described Hardin as wearing a black shirt over a grey shirt, and khaki pants. When shown the photograph, Weaver was immediately able to recognize Hardin as one of the men who robbed the store and explained he was one hundred percent certain of the identification.
Berry testified she got a good look at Hardin because she was face-to-face with and less than a foot away from him when he pulled her into the store. She noted Hardin was wearing a lavender shirt with a black t-shirt over it, blue jeans, a hat, and sunglasses. Like Sims and Weaver, Berry was immediately able to identify Hardin as the robber who tied her up when presented with the photograph, and she was one hundred percent certain of the identification.
Based on the victims' testimony as well as the testimony of the police officers who took the photograph of Hardin, texted it to Orangeburg, and showed it to the victims, the circuit court evaluated the likelihood of misidentification. In determining the out-of-court identifications were reliable and denying Hardin's motion to exclude them, the court noted: (1) the victims had ample opportunity during daylight hours to view the robbers at the time of the crime, (2) the victims were able to pay close attention to what the person looked like, (3) the victims gave accurate descriptions of the perpetrator, (4) the victims testified their level of certainty was one hundred percent, and (5) only a short amount of time elapsed between the armed robbery and the victims' identifications.
"Generally, the decision to admit an eyewitness identification is at the trial judge's discretion and will not be **13 disturbed on appeal absent an abuse of such[ ] or the commission of prejudicial legal error." State v. Moore , 343 S.C. 282, 288, 540 S.E.2d 445, 448 (2000). "However, an eyewitness identification [that] is unreliable because of suggestive line-up procedures is constitutionally inadmissible as a matter of law." Id ."A criminal defendant may be deprived of due process of law by an identification procedure arranged by police [that] is unnecessarily suggestive and conducive to irreparable mistaken identification." State v. Traylor , 360 S.C. 74, 81, 600 S.E.2d 523, 526 (2004). "Single person show-ups are particularly disfavored in the law." Moore , 343 S.C. at 287, 540 S.E.2d at 448.
In Neil v. Biggers , 409 U.S. 188, 196-99, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), the United States Supreme Court set forth a two-pronged inquiry to determine whether due process requires suppression of an eyewitness identification. Initially, the trial court must determine whether the identification resulted from "unnecessarily suggestive" police procedures. State v. Dukes , 404 S.C. 553, 557-58, 745 S.E.2d 137, 139 (Ct. App. 2013) (citing Biggers , 409 U.S. at 198-99, 93 S.Ct. 375 ). If the court determines the identification did not result from unnecessarily suggestive police procedures, the inquiry ends. Id. However, if the court finds law enforcement used "an impermissibly suggestive identification procedure, it must then determine whether the identification was nevertheless 'so reliable that no substantial likelihood of misidentification existed.' " Id. (quoting State v. Liverman , 398 S.C. 130, 138, 727 S.E.2d 422, 426 (2012) ). Under the totality of the circumstances, courts are to consider these factors in assessing the reliability of an otherwise unnecessarily suggestive identification procedure: (1) the witness's opportunity to view the perpetrator at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the perpetrator, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. Manson v. Brathwaite , 432 U.S. 98, 114-16, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).
Here, the victims testified one assailant had a nylon stocking over his face, while the other wore sunglasses and a **14 ball cap. Although the record indicates Weaver spent a reasonable amount of time prior to the robbery interacting with a customer he believed *184 to be Hardin, Sims and Berry did not. Sims only briefly saw the man he believed to be Hardin talking with Weaver prior to the robbery; however, Berry testified she was taking a smoke break behind T-Mobile during this time. In fact, Berry never saw the men until one of them pulled her back inside the store. The victims provided differing descriptions of the assailants' clothing. Considering all these facts, we have no doubt the single photograph of Hardin and a uniformed officer, shown to the victims on a cell phone screen by another uniformed officer in the hours after the robbery, was unduly suggestive.
Under the totality of the circumstances, we find the circuit court erred in assessing the reliability of an otherwise unnecessarily suggestive identification procedure. See Manson , 432 U.S. at 114-16, 97 S.Ct. 2243 (explaining the factors courts must consider in assessing the reliability of an otherwise unnecessarily suggestive identification procedure). Our review of the record reveals (1) the victims did not have ample opportunity to view the disguised assailants at the time of the crime as the victims were face-down on the floor for most of the robbery; (2) based on their descriptions of the assailants, which focused on their clothing rather than their physical appearances, the victims did not and probably could not pay close attention to their appearances; and (3) the victims did not accurately describe the armed and disguised men to police-they merely noted the assailants were black males, one of whom was taller than the other, and what clothing they wore. Cf. Moore , 343 S.C. at 289, 540 S.E.2d at 449 ("Third, the degree of accuracy of [the eyewitness's] description is tenuous, at best. Her descriptions were based primarily on the suspects' clothing and race, and that one was taller than the other. She really did not get a look at either suspect's face[ ] but saw one from the profile.").
Regarding the third factor, the State conceded as much in its brief: "Although not perfectly aligned in every single detail, the [v]ictims all gave very consistent descriptions of [Hardin,] which focused on his hat, his sunglasses, and his black shirt ." (emphasis added). While the victims testified they were one hundred percent certain that Hardin was one of the assailants, **15 and the length of time between the robbery and the identifications was only a little over three hours, we do not believe these two factors alone suffice to support a finding that the out-of-court identifications were proper and admissible. See Moore , 343 S.C. at 288, 540 S.E.2d at 448 ("Generally, the decision to admit an eyewitness identification is at the trial judge's discretion and will not be disturbed on appeal absent an abuse of such[ ] or the commission of prejudicial legal error. However, an eyewitness identification [that] is unreliable because of suggestive line-up procedures is constitutionally inadmissible as a matter of law." (citations omitted) ).
Still, we must determine whether any error in admitting the out-of-court identifications could have reasonably affected the outcome of the trial. See State v. Adams , 354 S.C. 361, 380, 580 S.E.2d 785, 795 (Ct. App. 2003) ("Error is harmless where it could not reasonably have affected the result of the trial."); id. at 381, 580 S.E.2d at 795 ("Generally, appellate courts will not set aside convictions due to insubstantial errors not affecting the result."); id. ("Thus, an insubstantial error not affecting the result of the trial is harmless where 'guilt has been conclusively proven by competent evidence such that no other rational conclusion can be reached.'" (quoting State v. Bailey , 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989) ) ); see also State v. Kelley , 319 S.C. 173, 460 S.E.2d 368 (1995) (explaining that when guilt is conclusively proven by competent evidence, such that no other rational conclusion could be reached, an appellate court will not set aside a conviction for insubstantial errors not affecting the result).
Aside from the cell phone photograph, admitted as State's Exhibit 2, and the identification testimony implicating Hardin, the State also presented substantial evidence independently establishing Hardin's participation in the T-Mobile armed robbery: the witnesses' identification of the getaway Toyota, the employee victims' identification of the guns found in Hardin's apartment as the guns used in the armed robbery, and law *185 enforcement's discovery of T-Mobile merchandise and the stolen iPad in or near Hardin's apartment less than three hours after the crime. See State v. Simmons , 308 S.C. 80, 83, 417 S.E.2d 92, 94 (1992) ("We note that, under certain circumstances, if the identification is corroborated by either circumstantial or direct evidence, then the harmless error rule might **16 be applicable."). As the challenged identification evidence was cumulative to other properly admitted evidence, see infra section III, we find the erroneous admission of the out-of-court identifications was harmless beyond a reasonable doubt.
III. Motion to Suppress Evidence
Hardin argues the circuit court erred in admitting any evidence collected in what he characterizes as the "second search" of his apartment because he effectively withdrew consent by refusing to re-sign the consent to search form. Hardin contends law enforcement was required to obtain a search warrant prior to the second search. We disagree.
Pretrial, Investigator Wade testified he assisted Corporal Cain in tracking the movement of the stolen iPad; the track ended at Hardin's apartment complex in Columbia. Wade offered testimony consistent with Cain's regarding locating the car matching the description of the fleeing Toyota sedan and encountering Hardin as he exited the apartment. Hardin admitted to Wade that he rented the Toyota.
Wade told Hardin they were looking for a man who walked with a limp and a stolen iPad and that Hardin gave written consent for law enforcement to search his apartment. Wade testified that Hardin did not object to the second search, which followed the perimeter safety sweep, or otherwise withdraw his consent, even though Hardin knew he could stop the search at any time. On cross-examination, Wade admitted there were four officers present when they first approached Hardin and that they conducted a pat-down search for weapons before asking for his consent to search the apartment.
Hardin testified that as he came out of his apartment and was getting into the rented Toyota, eight officers approached him with their guns drawn, patted him down, and searched the Toyota immediately after he got out with his hands up. He claimed that when Investigator Wade asked to search his apartment, he responded, "[Y]'all don't have a warrant. No, you can't search my apartment." Hardin alleged Wade said they would detain him while they went back to Orangeburg to get a warrant, so in order to "alleviate the scene," he agreed to sign the consent to search form. He admitted he did not feel **17 pressured to give the written consent but "felt it would be best just to get it over with."
Hardin was handcuffed outside the door of his apartment during the perimeter sweep, but the officers then locked the apartment door and took him down to a patrol car. Officer Cain retrieved the apartment key from another officer and went back to search a second time. Hardin testified that when Cain came back to the parking lot, Wade again approached Hardin with the written consent form. However, Hardin further contends he told Wade, "I'm not going to sign that form no [sic] more ... [Y]'all searched my apartment one time [and] you didn't find anything. You went back in there without me being present. I don't know what you done [sic] or what you did [sic] do, but I'm not signing it."
On cross-examination, Hardin admitted he never told law enforcement to stop the search or that he did not want them searching his apartment. On redirect, however, Hardin claimed that when he said he never withdrew consent, he was only referring to the "first search." He reiterated that he never gave the police consent to search the apartment a second time and he did not re-sign the consent form after Wade added the additional language referencing firearms.
The circuit court held "the consent was valid and voluntary" and thus, "the search is valid and the items that were found in the apartment and in the car are admissible." The court found the officers' testimony was credible and Hardin's testimony was contradictory, which raised questions about his veracity. Ultimately, the circuit court concluded, "the added language in [the consent form] was explained to [Hardin] and the *186 consent was never withdrawn and, therefore, the items that were found will be admissible."
"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.' " Whren v. United States , 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (quoting U.S. Const. amend. IV ); see also S.C. Const. art. I, § 10 (protecting "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures"). The touchstone of the **18 Fourth Amendment is reasonableness." Florida v. Jimeno , 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).
The exclusionary rule is a deterrent sanction by which the prosecution is barred from introducing evidence obtained in violation of the Fourth Amendment. State v. Brown , 401 S.C. 82, 88, 736 S.E.2d 263, 266 (2012) (citing Davis v. United States , 564 U.S. 229, 231, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011) ). "Warrantless searches and seizures are unreasonable absent a recognized exception to the warrant requirement." Brown , 401 S.C. at 89, 736 S.E.2d at 266 (quoting State v. Wright , 391 S.C. 436, 442, 706 S.E.2d 324, 327 (2011) ). "These exceptions include the following: (1) search incident to a lawful arrest, (2) hot pursuit, (3) stop and frisk, (4) automobile exception, (5) the plain view doctrine, (6) consent, and (7) abandonment." Id.
In State v. Mattison , 352 S.C. 577, 584, 575 S.E.2d 852, 855 (Ct. App. 2003), this court discussed the issue of voluntary consent to search:
Whether a consent to search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. The State bears the burden of establishing the voluntariness of the consent. The "totality of the circumstances" test applies whether the consent was given in a non-custodial or custodial situation. In a custodial situation, the custodial setting is a factor to be considered in determining whether consent was voluntarily given. Custody alone, however, is not enough in itself to demonstrate a coerced consent to search.
The issue of voluntary consent, when contested by contradicting testimony, is an issue of credibility to be determined by the trial judge. A trial judge's conclusions on issues of fact regarding voluntariness will not be disturbed on appeal unless so manifestly erroneous as to be an abuse of discretion.
(citations omitted). "Conduct falling short of 'an unequivocal act or statement of withdrawal' is not sufficiently indicative of an intent to withdraw consent." Id. at 587, 575 S.E.2d at 857. "Effective withdrawal of a consent to search requires unequivocal conduct, in the form of either an act, statement, or some **19 combination of the two, that is inconsistent with consent previously given." Id.
Hardin contends he effectively withdrew his consent when he refused to re-sign the consent to search form, admitted as State's Exhibit 1, after Wade amended the form to include "any firearms, handguns." But our review of the record reveals Hardin had already given written consent for the search of his apartment and placed no limits on the scope of that consent. Although there is conflicting testimony as to whether Hardin attempted to withdraw consent prior to the "second search," Hardin admitted on cross-examination that he did not withdraw consent. We recognize that Hardin attempted to clarify on redirect that he meant he never withdrew consent as to the initial search. However, the circuit court assessed the credibility of the various witnesses and declined to accept as credible Hardin's assertion that he withdrew consent; unequivocally or otherwise. See Mattison , 352 S.C. at 584-85, 575 S.E.2d at 856 ("The issue of voluntary consent, when contested by contradicting testimony, is an issue of credibility to be determined by the trial judge.").
Hardin's refusal to re-sign the consent form falls short of the necessary unequivocal act or statement of withdrawal, particularly in light of Wade's testimony that Hardin did not object to the search or otherwise attempt to withdraw his consent. See id="p187" href="#p187" data-label="187" data-citation-index="1" class="page-label">*187id. at 585, 575 S.E.2d at 858 (holding the defendant's act of lowering his hands as the officer searched his groin area fell short of an unequivocal act or statement of withdrawal). Under the totality of circumstances, the evidence presented at the suppression hearing supports the circuit court's finding that Hardin's consent was valid and the recovered evidence admissible.
Conclusion
Hardin's convictions are
AFFIRMED.
HUFF and GEATHERS, JJ., concur.

Law enforcement officers testified at trial that Black was still under investigation.

See id. at 436, 735 S.E.2d at 479 (holding "section 1-7-330 is unconstitutional beyond a reasonable doubt"); S.C. Code Ann. § 1-7-330 (2005) ("The solicitors shall attend the courts of general sessions for their respective circuits. Preparation of the dockets for general sessions courts shall be exclusively vested in the circuit solicitor[,] and the solicitor shall determine the order in which cases on the docket are called for trial. Provided , however, that no later than seven days prior to the beginning of each term of general sessions court, the solicitor in each circuit shall prepare and publish a docket setting forth the cases to be called for trial during the term.").

See id. at 329-31, 126 S.Ct. 1727 (finding South Carolina's application of "arbitrary" third-party guilt rule focusing on strength of prosecution's case with "little, if any, examination of the credibility of the prosecution's witnesses or the reliability of its evidence" did not rationally serve the end third-party guilt evidentiary rules were designed to further and "violate[d] a criminal defendant's right to have 'a meaningful opportunity to present a complete defense.' " (quoting Crane v. Kentucky , 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ) ).

It is unclear whether this was SLED's policy or simply a decision by the State in this case. In any event, witnesses for the State testified there was an ongoing investigation regarding the unapprehended accomplice and that some of the DNA evidence "may" be tested for any subsequent prosecution.

Sims testified T-Mobile kept old paperwork in Nexus boxes.

Investigator William Ketcherside conducted a direct comparison of the fingerprints collected in the investigation to Hardin's fingerprints; they did not match. None of the collected fingerprints were run through the Automated Fingerprint Index System (AFIS).

"The term touch DNA refers to DNA that is left behind after a person touches or otherwise comes into direct contact with a physical item." Daniel M. Hart, Constitutional Issues Raised by the Development of Microbial Cloud Analysis , 33 Syracuse J. Sci. & Tech. L. 74, 93-94 (2017).

The uniformed officer is clearly visible in the photograph.