# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

John Upson, Respondent,

v.

State of South Carolina, Petitioner.

Appellate Case No. 2018-001674

―――――――

## ON WRIT OF CERTIORARI

―――――――

Appeal from Aiken County
R. Scott Sprouse, Post-Conviction Relief Judge

―――――――

Opinion No. 6049
Heard December 7, 2023 – Filed January 31, 2024

―――――――

## REVERSED

―――――――

Attorney General Alan Wilson and Senior Assistant
Attorney General Mark Reynolds Farthing, both of
Columbia, for Petitioner.

Tommy Arthur Thomas, of Irmo, for Respondent.

―――――――

**GEATHERS, J.:** The State of South Carolina (the State) appeals an order from the post-conviction relief (PCR) court granting John Upson's PCR application for ineffective assistance of counsel. The State argues the PCR court erred in finding that trial counsel was constitutionally ineffective by (1) failing to challenge or

otherwise determine the admissibility of eyewitness identification evidence, (2) failing to cross-examine a witness who testified that Upson had a "lazy eye," and (3) failing to challenge the State's testimony discrediting Upson's alibi with an expert witness of his own. We reverse.

## FACTS

John Upson was convicted in April 2014 of armed robbery and two counts of kidnapping and sentenced to twenty years' imprisonment for robbing a Captain D's restaurant.

Shortly after the restaurant had closed for the business day, Upson and another individual—both wearing black sweatpants, black hoodies, and bandanas covering their faces up to their eyes—entered and forced the employees into the freezer while they robbed the restaurant. Upson remained in the back of the restaurant near the freezer with the employees while the other individual, who was armed with a gun, took money from the front of the restaurant.

About a half-hour later, after the robbers left, the employees exited the freezer and called the police. When the police arrived, one of the employees, Jameshia Alston, gave a statement indicating that she recognized Upson's face—but did not know his name—because he had come into the restaurant two days prior, ordered a drink, and took a picture with one of her coworkers, William Keels.[1] Based on this recognition, Alston went home that night and scrolled through Keels's friends list on Facebook in the hopes of learning Upson's name.[2] Alston testified at trial that she conducted this Facebook search of her own volition and not at the behest of the police. Detective William Royster of the Aiken Department of Public Safety also testified at trial that he did not direct Alston to try to identify the robber on Facebook.

_____

[1] At his PCR hearing, Upson admitted to this, testifying, "I was in [Captain D's] on Monday before three—two [or] three days before this happened. Came in, we ordered some fish, and I used to date William Keels's sister. Hadn't seen [Keels] since he was a teenager. Long story short, he came out, we talked, [and] we left the restaurant."

[2] Explaining how a Facebook friends list works, Alston testified at trial, "[One] can scroll through a [Facebook] friend[s] list. And I saw [Upson's] picture and I clicked on his name. I didn't know his name at the time[,] but I clicked on it because I knew his face."

While scrolling through Keels's friends list, Alston came upon Upson's profile picture and recognized him as one of the robbers. She then clicked on his page and subsequently downloaded two pictures from Upson's Facebook page and emailed them and Upson's name to Detective Royster. This led to Upson's arrest.

At trial, Upson's counsel asked Alston about her Facebook investigation. When trial counsel asked Alston if she was ever shown a police lineup, she replied that she had been shown "[a] list of names." Trial counsel did not ask when the police provided the list or whether Upson's name appeared on it.[3] The PCR court later found that Alston "pulled a photograph from Facebook *before* speaking with law enforcement." (emphasis added).

Alston also testified at trial that she remembered Upson's "bald head" and his eyes because "[h]e has a lazy eye. It's kind of droopy, like that." Although trial counsel did not immediately challenge this characterization, he did hold up pictures of celebrities with their faces covered, except for their eyes and nose, throughout his closing argument and asked the jury if they could identify the celebrities to illustrate the difficulty Alston would have had identifying Upson.

Upson had relied on an alibi theory for his defense at trial—claiming that he was attending a comedy show and an after-party on the night the robbery occurred—and called three witnesses to support this theory. Even though each witness testified to seeing Upson either before or after the show, two of the witnesses did not specifically testify to seeing Upson *during* the show and the third witness specifically testified to *not* seeing him during the show.

To discredit Upson's alibi, the State utilized cell phone data to establish Upson's possible movement and call activity. One of the State's witnesses—though not qualified as an expert[4]—explained that the data showed Upson's cell phone had been used to make ten phone calls between 9:00 p.m. and 10:00 p.m. on the night of

---

[3] Trial counsel did not pursue the point, and it was never mentioned again.

[4] The witness was Desra Fraser, an intelligence research specialist for the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

the robbery,[5] including three to Captain D's.[6]  In its closing argument, the State pointed out that many of these calls would have been made from Upson's phone while Upson was purportedly attending the comedy show.

The State's witness also used raw data from Upson's phone carrier to generate a series of maps that were intended to show that Upson's phone could have been moving when the calls were made.[7]  Importantly, the State did not claim that this data showed Upson was at Captain D's at the time of the crime, only that it showed he was placing phone calls and potentially on the move while the comedy show was taking place.

The jury found Upson guilty of armed robbery and kidnapping, and the trial judge sentenced him to concurrent, twenty-year sentences for each conviction. Upson appealed to this court, and his convictions were affirmed on June 1, 2016. *State v. Upson*, Op. No. 2016-UP-237 (S.C. Ct. App. filed June 1, 2016).

Upson then filed a PCR application in 2017.  The PCR court heard the matter in August 2018 and granted Upson PCR on the grounds that trial counsel was ineffective for (1) "fail[ing] to challenge [Alston's Facebook identification] by either requesting a *Neil v. Biggers*[8] hearing or by objecting to its admission at trial," (2) failing to challenge Alston's "lazy eye" testimony,[9] and (3) failing to challenge the State's expert testimony and cell phone data discrediting Upson's alibi.  The PCR

---

[5] The robbery took place around 10:15 p.m.

[6] At least one of these calls was done by first dialing *67, which is a standard vertical service code (VSC) used to block caller ID when placing a phone call.  *Vertical Service Codes*, North American Numbering Plan Administrator, https://nationalnanpa.com/number_resource_info/vsc_definitions.html.

[7] The maps were generated using software called Pen-Link and the "pie method," which involves drawing pie-shaped wedges to simulate the area in which a cell phone pinging off the tower could be located.

[8] 409 U.S. 188 (1972).

[9] The PCR court also noted that it "had the opportunity to personally study [Upson]'s facial features" at the evidentiary hearing and found that "[Upson] clearly did not have a 'lazy eye.'"  It then indicated its concern "that this evidences a misidentification that led to [Upson]'s conviction."

court found that "trial counsel's deficient performance . . . prejudiced [Upson]." Trial counsel had moved out of state by the time the PCR hearing was held, and the PCR court sustained Upson's objection to allowing trial counsel to testify by telephone. The PCR court left the record open for thirty days to allow the State to add trial counsel's testimony, but the State did not elect to do so. The State petitioned for a writ of certiorari, and this court granted it in November 2021.

## ISSUES ON APPEAL

I. Did the PCR court err by finding that trial counsel was ineffective for failing to challenge or otherwise determine the admissibility of eyewitness identification evidence?

II. Did the PCR court err by finding that trial counsel was ineffective for failing to cross-examine a witness who testified that Upson had a lazy eye?

III. Did the PCR court err by finding that trial counsel was ineffective for failing to challenge the State's cell phone data evidence that was used to discredit Upson's alibi?

## STANDARD OF REVIEW

"Our standard of review in PCR cases depends on the specific issue before us. We defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them." *Smalls v. State*, 422 S.C. 174, 180, 810 S.E.2d 836, 839 (2018). "However, [we] will reverse the [PCR] court's decision if it is controlled by an error of law." *Milledge v. State*, 422 S.C. 366, 374, 811 S.E.2d 796, 800 (2018). "We review questions of law de novo, with no deference to trial courts." *Smalls*, 422 S.C. at 180–81, 810 S.E.2d 836 at 839–40.

## LAW AND ANALYSIS

To establish an ineffective assistance of counsel claim, PCR applicants must show "(1) counsel failed to render reasonably effective assistance under prevailing professional norms, and (2) counsel's deficient performance prejudiced the applicant's case." *Speaks v. State*, 377 S.C. 396, 399, 660 S.E.2d 512, 514 (2008). Deficiency "is measured by an objective standard of reasonableness." *Taylor v. State*, 404 S.C. 350, 359, 745 S.E.2d 97, 102 (2013). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington*, 466

U.S. 668, 690 (1984). To establish prejudice, a PCR applicant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

We reverse the PCR court's order. We will discuss each of the three grounds upon which the PCR court rested its ruling.

## I. Trial Counsel's Failure to Challenge Alston's Out-of-Court Identification of Upson

The State argues that the PCR court erred in finding that trial counsel was ineffective for his failure to request a *Neil v. Biggers* hearing or otherwise object to the admissibility of Alston's Facebook investigation. We hold that the PCR court erred on this ground. Trial counsel's failure to request a hearing or otherwise object could not have constituted deficient performance because a witness's independent identification process in which the state is not involved cannot be said to be unduly suggestive.

In-court identifications are inadmissible "if a suggestive[,] out-of-court identification procedure created a very substantial likelihood of irreparable misidentification." *State v. Traylor*, 360 S.C. 74, 81, 600 S.E.2d 523, 526 (2004). There are two prongs that must be established to determine if an out of court identification is inadmissible: (1) whether the identification process was unduly suggestive, and (2) whether the identification was nevertheless so reliable that no substantial likelihood of misidentification existed. *State v. Moore*, 343 S.C. 282, 287, 540 S.E.2d 445, 447 (2000). "Only if [the procedure] was suggestive need the court consider the second question[.]" *Id.* (first alteration in original) (quoting *Jefferson v. State*, 425 S.E.2d 915, 918 (Ga. Ct. App. 1992)). "The fallibility of eyewitness evidence does not, *without the taint of improper state conduct*, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness." *State v. Liverman*, 398 S.C. 130, 140, 727 S.E.2d 422, 427 (2012) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 245 (2012)). Furthermore, "[a] primary aim" of a *Neil v. Biggers* hearing is "to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." *Perry*, 565 U.S. at 241. The "due process concerns [*Neil v. Biggers* guards against] arise only when law enforcement officers use an identification procedure that is *both* suggestive and unnecessary." *Id.* at 238–39 (emphasis added); *see also State v. Tisdale*, 338 S.C. 607, 612, 527 S.E.2d 389, 392 (Ct. App. 2000) (per curiam) ("[T]he impetus behind the harsh remedy of exclusion is police

deterrence. . . . Thus, we hold that [a *Neil v. Biggers*] analysis is inapplicable where there is a nongovernmental identification source.").

The PCR court found that Alston "pulled a photograph from Facebook *before* speaking with law enforcement." (emphasis added). It further found that Alston was later presented with a list of names that included Upson's name, but that trial counsel failed to challenge this by either requesting a *Neil v. Biggers* hearing or by objecting to its admission at trial.

Alston's testimony establishes that she was looking through Keels's Facebook friends list because she recognized one of the men in the robbery as the same man who had been in Captain D's days prior and who had taken a photo with Keels. When Alston recognized Upson's profile picture on Keels's friends list, she took note of the corresponding profile name. Alston made clear in her testimony that she was searching for a *picture* she recognized, not a *name* she had been given beforehand. Specifically, Alston explained that "[one] can scroll through a [Facebook] friend[s] list. And I saw [Upson's] picture and I clicked on his name. I didn't know his name at the time[,] but I clicked on it because I knew his face."

Combining this with the PCR court's finding that any list of names given to Alston by the police appeared only *after* Alston's Facebook investigation, the appendix contains no evidence that law enforcement had anything to do with Alston's identification of Upson; rather, she testified this was something she "decided to take it to [her] own and do it [herself]." We hold the PCR court erred in finding that this failure to challenge the identification constituted deficient performance.

The first prong of *Neil v. Biggers* requires finding that the identification process was unduly suggestive in order to exclude an identification. Because law enforcement was not involved in the process Alston employed to identify Upson, the process could not have been unduly suggestive. *See Perry*, 565 U.S. at 248 ("[W]e hold that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances *arranged by law enforcement*." (emphasis added)). If the first prong fails, the court does not need to reach the second prong. *Id.* at 235 (upholding the trial court's conclusion that because the witness "spontaneously" and "without any inducement from the police" identified the defendant, the reliability of this identification was for the jury to consider); *State v. Dukes*, 404 S.C. 553, 557–58, 745 S.E.2d 137, 139 (Ct. App. 2013) ("If the court finds [an] identification did not result from impermissibly

suggestive police procedures, the inquiry [under *Neil v. Biggers*] ends there and the court does not need to consider the second prong."). Consequently, trial counsel's decision not to challenge Alston's identification cannot be said to have fallen below an objective standard of reasonableness.

## II. Trial Counsel's Failure to Cross-Examine Alston's Testimony that She Recognized Upson from His Lazy Eye

The State also argues that the PCR court erred in finding that counsel was ineffective for failing to cross-examine Alston on her testimony that she recognized Upson in part due to his lazy eye. We reverse the PCR court on this ground—trial counsel thoroughly tested the mettle of Alston's identification testimony throughout the trial, notwithstanding any failure to directly challenge her testimony on cross-examination. Consequently, trial counsel was not ineffective on this ground.

Alston testified that she recognized Upson because "[h]e has a lazy eye. It's kind of droopy, like that." While trial counsel did not immediately challenge Alston's claim that Upson had a lazy eye on cross-examination, trial counsel *did* challenge the reliability of Alston's identification. During cross-examination, trial counsel elicited testimony from Alston that revealed that much of Upson's face was covered by a bandana and a hoodie during the robbery.

Furthermore, during closing arguments, trial counsel utilized a tactic with the jury whereby he held up photos of three celebrities' faces with everything covered except their eyes and nose. Trial counsel used this tactic to demonstrate the difficulty that Alston would have had identifying Upson, whose features were covered and whom Alston had seen only once before. Because trial counsel thoroughly challenged the reliability of Alston's identification testimony, trial counsel's performance did not fall below an objective standard of reasonableness. *See Huggler v. State*, 360 S.C. 627, 635, 602 S.E.2d 753, 757 (2004) (holding that trial counsel was not ineffective for failing to cross-examine child witnesses on inconsistencies between direct testimonies and written statements when counsel instead chose to highlight the inconsistencies in closing), *abrogated on other grounds by Smalls v. State*, 422 S.C. 174, 810 S.E.2d 836 (2018); *Ard v. Catoe*, 372 S.C. 318, 336, 642 S.E.2d 590, 599 (2007) (Toal, C.J., dissenting) ("[Defendant]'s trial counsel adequately investigated the issue of gunshot residue on the victim's hands[,] and their failure to cross-examine the State's gunshot residue expert was neither deficient nor prejudicial to [defendant].").

The PCR court also found that Upson did not have a lazy eye based on its "opportunity to personally study" Upson during the hearing. However, the jurors had the same opportunity to study Upson at trial and decide for themselves if they believed Alston's description of Upson was consistent with his appearance in the courtroom. Based on the jurors' decision to convict, they could have either agreed with Alston's characterization of Upson's eyelid as "droopy," or simply disregarded this portion of her testimony and decided to convict in light of her other bases for recognizing Upson. Specifically, Alston also identified Upson by "his bald head" and recognized the visible portions of his face from his interaction with Keels in the restaurant days prior. This means that the failure of Upson's trial counsel to cross-examine Alston on her lazy eye description could not have been prejudicial even if it was deficient—either way, the jurors would have made their own determinations in this regard and decided how that affected the overall reliability of Alston's identification. *Cf. State v. Odom*, 412 S.C. 253, 268, 772 S.E.2d 149, 156 (2015) ("It is uniformly the rule that a defendant's physical appearance may be considered by the jury in determining his or her age." (quoting *State v. Lauritsen*, 261 N.W.2d 755, 757 (Neb. 1978))); *Melton v. Williams*, 281 S.C. 182, 186, 314 S.E.2d 612, 614–15 (Ct. App. 1984) ("Assessment of the credibility of witnesses is a question for the jury, not the court, and it is the jury that decides the weight to be afforded the testimony."); *Goss v. State*, 425 S.C. 101, 108, 820 S.E.2d 373, 376 (2018) ("When a factfinder evaluates the credibility of witnesses, the mental process employed often requires the credibility evaluations to be based upon a consideration of all the evidence, not simply the parts the factfinder chooses to see and hear first-hand.").

### III. Trial Counsel's Failure to Challenge the State's Cell Phone Data Evidence Used to Discredit Upson's Alibi

Finally, the State challenges the PCR court's finding that trial counsel was ineffective for not calling an expert witness to testify on Upson's behalf to challenge the cell phone data the State relied on to discredit Upson's alibi. We reverse the PCR court on this ground because regardless of whether trial counsel's failure constituted deficient performance, Upson suffered no prejudice.

During the PCR hearing, Upson called Thomas Slovenski, a mobile phone forensics expert, as a witness. Slovenski criticized the cell phone maps presented by the State's witness at trial as confusing. Slovenski also noted that Pen-Link's accuracy as a software is "depend[e]nt a good bit . . . on the person who's actually using Pen-Link" and that another piece of software called TraX was better. Slovenski ran the raw cell phone data the State's witness used through TraX, instead

of Pen-Link, but conceded that "[o]n a couple of the maps[,] [it] look[s] like [the State] got it correct, but then . . . there's one that I can show you that it's an anomaly."

Further, Slovenski acknowledged that Pen-Link was the only available software at the time of Upson's trial and that Slovenski himself would have used Pen-Link for interpreting the data and the pie method for presenting it—just like the State's witness did. TraX—the software Slovenski said was better—did not exist until 2015, after Upson's trial.

To the extent Upson argues otherwise, trial counsel could not have been deficient for failing to enlist an expert to employ a technology that did not yet exist. *See Tillman v. State*, 244 S.C. 259, 264–65, 136 S.E.2d 300, 303 (1964) ("[Counsel] is not required . . . to do the impossible[] since the defendant is entitled to a fair trial and not a perfect one[.]"); *Smith v. State*, 386 S.C. 562, 567, 689 S.E.2d 629, 632 (2010) ("Counsel's performance is accorded a favorable presumption, and a reviewing court proceeds from the rebuttable presumption that counsel 'rendered adequate assistance and made all significant decisions in the exercise of reasonable[,] professional judgment.'" (quoting *Strickland*, 466 U.S. at 690)).

However, even if trial counsel was deficient in some other capacity by failing to call an expert witness, Upson was not prejudiced by this deficiency. Slovenski's testimony was largely consistent with the evidence introduced by the State during trial. The State relied on cell phone data as strong evidence that calls were placed via Upson's phone to Captain D's just before the restaurant was robbed, all while he was allegedly attending a comedy show. The State also used it to show that Upson may have been moving around town during this time. Slovenski's ultimate conclusion was that he could not "confirm any data that shows [Upson's cell phone] being used at or in the immediate area of Captain D's at the time of the incident." This is consistent with the State's presentation of the cell phone evidence at trial— the State never argued its maps showed Upson was actually at Captain D's when the robbery was committed.

Slovenski's testimony did not challenge the State's framing of the takeaways from the data. It established only that a more modern method could have resulted in a more accurate map. It did not discredit the call log tied to Upson's phone. Nor did Slovenski establish that he would have utilized a different method than the State's witness did—he admitted he would have used the same pie method that was employed at trial. We hold this does not create a level of doubt in the outcome of the trial sufficient enough to show prejudice from trial counsel's decision not to retain a cell phone data expert of his own. *See Strickland*, 466 U.S. at 694 ("The

[applicant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

## CONCLUSION

For the foregoing reasons, the PCR court's order is

**REVERSED.**

**THOMAS and KONDUROS, JJ., concur.**